**Exhibit C**

# LICENSE AGREEMENT

THIS LICENSE, made the        day of February        , 2003, by and between the VILLAGE OF BAYVILLE, a municipal corporation having an office at 34 School Street, Bayville, New York, hereinafter referred to as "Licensor", and, a limited partnership, having an office at c/o                , New Jersey        , hereinafter referred to as "Licensee" or "SPRINT".

WHEREAS, Licensor is the owner of certain real property described in Exhibit "1" annexed hereto; and

WHEREAS, SPRINT desires to use a portion of said property and the elevated water tank (hereafter referred to as the "Licensed Property") for installation, maintenance and operation of a wireless communications facility and other associated equipment in connection with its providing of communications services;

NOW, THEREFORE, in consideration of all the foregoing, and in further consideration of the premises, obligations, terms and conditions hereinafter set forth and recited, both parties do hereby agree as follows:

1. PREMISES: Licensor grants to SPRINT, the non- exclusive License to use that portion of the Property located at                , Bayville, New York, as specifically set forth and described in Exhibit 2 attached hereto and referred to as the "Licensed Property".

2. ACCESS TO PREMISES: Licensor grants SPRINT the right of access to the Licensed Property. It is expressly understood and agreed, and Licensor acknowledges, that SPRINT is entering into this License in reliance on the representation that SPRINT, its officers, employees,

1

agents, invitee, licensees, and representatives shall have the right of access to the licensed premises through the real property of which the Licensed Property forms a part as specified below, during regular business hours. Any access to the Licensed Property other than during regular business hours of the Licensor shall be for emergency repair purposes only, unless prior agreement in writing from the Licensor is obtained by SPRINT. SPRINT agrees to mitigate noise during all repair operations performed at the Licensed Property.

3. <u>USE OF PREMISES</u>: (a) The Licensed Property is to be used for the installation, operation and maintenance of a wireless communications facility along with associated other electronic equipment which may be passive and/or active and no other purpose. SPRINT shall have the right to install up to nine (9) antennas, fencing, equipment shelter as shown in a site plan attached hereto as Exhibit 3. The Initialing of Exhibit "3" shall be deemed as Licensor's approval of antenna configuration and equipment placement. Other similar equipment shall be permitted by Licensor, providing such equipment placed by other licensees does not interfere with Licensee's transmissions.

All Licensee's equipment or other property attached to or otherwise brought onto the Licensed Property by SPRINT shall at all times be personal property of SPRINT and, at SPRINT's option, may be removed by SPRINT at any time during the term or within a reasonable time after expiration of this License. Any damage caused by the Licensee as a result of the removal by SPRINT of its equipment shall be repaired by the Licensee to the satisfaction of the Licensor.

SPRINT agrees to cooperate with the Licensor during water tank repainting by Licensor. Said cooperation shall include the repositioning of SPRINT'S equipment on Licensor's Property to accommodate the repainting process. Licensor shall give Licensee 30 days written notice if Licensee's equipment requires repositioning. Upon the completion of the repair or repainting

2

process, the Licensee shall return to its previous position on the Licensed Property.

(b)  SPRINT shall have the right to use whatever appropriate means it deems appropriate to install its equipment, subject to the prior approval in writing of the engineer of the Licensor and consistent with the operation of the business of the Licensor.  Licensor acknowledges that in order for SPRINT to install and operate its equipment, it will require the right to install and maintain transmission lines from the equipment shelter to the antenna location, install and maintain power from the main feed to the equipment shelter, and install and maintain telephone lines from the main telephone entry point to the equipment shelter.  SPRINT shall have the right, subject to the approval of the Licensor, at any time during the term hereof, at its own expense, to erect, construct or make any improvements, alterations or additions upon or to the Licensed Property required by SPRINT's use, including, but not limited to, the right of SPRINT to enclose its equipment with fencing.  Except as provided elsewhere in this agreement, any such construction shall be subject to the building Code of the Village of Bayville and the approval of the engineer of the Licensor.  The Licensee agrees that the cost of the review of the site plan and construction plans, as well as construction supervision of Licensee's construction by the Village engineer, shall be paid for by the Licensee prior to plan approval and construction.  The Licensor agrees to act upon any construction request for approval within sixty days from the receipt of said request sent by certified mail, return receipt requested, to the office of the Licensor as provided in paragraph 16 of this agreement.  The Licensor shall have the right to select the exterior finish and color of SPRINT'S equipment structure.  SPRINT shall provide asphalt pavement to its equipment shelter at SPRINT's expense.  The provisions of this subparagraph (b) shall not be construed to permit more than nine (9) antennas or more than one equipment shelter.

3

(c)  Licensee shall have the right at any time following the full execution of this License, at reasonable times during business hours, to enter upon the premises for the purpose of making appropriate engineering and boundary surveys, inspections and test borings and other tests to determine the appropriateness of the Premises for the installation of Licensee's equipment. Due to increased security concerns, all entry onto the Licensor's Property and the conduct of any of the above mentioned tests or construction shall be required to receive the express prior permission of the Licensor.

Upon Licensee's request, at the expense of the Licensee, Licensor shall provide to the Licensee, to the extent available, copies of all structural drawings, surveys, of equipment and/or other information reasonably required in connection with Licensee's proposed installation of its equipment at the Licensed Property. Licensor shall cooperate with SPRINT and will join in any applications for governmental licenses, permits and approvals required of or deemed necessary by SPRINT for its use of the Licensed Property, including, without limitation, applications for business licenses and permits and applications for zoning variances, zoning ordinances amendments and special use permits, provided that SPRINT shall reimburse and hold Licensor harmless for any costs, fees or liability actually incurred by Licensor in connection with such applications and approvals. The Licensor believes that the Village Zoning Ordinance is not applicable to the construction and use provided for herein. The above provisions notwithstanding, Licensor agrees to assist the Licensee in any application for zoning approvals that may be made to the Licensor pertaining to the Licensed Property.

4. <u>INTERFERENCE:</u> (a) Licensor agrees to eliminate, without cost to the Licensee, any interference to SPRINT's operation caused by Licensor or anyone holding under Licensor in a

4

timely manner after oral and written notice thereof. If such interference cannot be eliminated within a reasonable length of time, Licensee's sole remedy shall be the right to terminate this License, remove its equipment, and restore the Premises to its original condition.

(b)  SPRINT agrees not to interfere with radio transmission or reception of other communications equipment properly located, prior to Licensee's installation, on the premises owned by Licensor or other licensees of which the Licensed Property forms a part. If SPRINT should cause such measurable interference, SPRINT shall eliminate it in a timely manner.

(c)  Licensor agrees not to erect any structure within or on the Property owned by the Licensor of which the Licensed Property forms a part, or permit the future installation of equipment which will result in technical interference problems with Licensee's then existing equipment.

(d)  The Licensee shall have the obligation to take all necessary steps to protect Licensee's equipment during tank maintenance activities of the Licensor.

5.  TERM:  The initial term of this License shall be for five (5) years commencing on the Commencement Date as defined in paragraph 6 below.  As used herein, "term" refers to the initial term and any renewal term as herein provided.  If, at any time during this License, the Licensed Property becomes unsuitable for a wireless communication facility due to: (a) governmental regulations, or (b) interference with SPRINT's operation that cannot be resolved; then in either event, SPRINT may terminate this License by giving notice to Licensor which shall be effective one hundred twenty (120) days after it is mailed by SPRINT.  None of the above items of suitably shall be construed to permit termination of this License on account of a less expensive site than the Licenses Property becomes available to the Licensee.

6.  LICENSE FEE:  (a)  For the first year of this License, SPRINT shall pay Licensor

5

an annual fee of $45,600.00, payable in equal monthly installments of the sum of $3,800.00, in advance on the first day of each month, commencing on the start of construction on the Licensed Property, but no later than March 1, 2003 (hereinafter referred to as the "Commencement Date"). If the term commences on any day other than the first day of a calendar month, a pro rata fraction of a full month's fee shall be paid for the partial month at the commencement of said term.

(b) ESCALATION:  On the annual anniversary date of each successive year of this License and any option to extend, the annual license fee shall increase at the rate of four percent (4%) per annum.

(c) TAX ADJUSTMENT:  The Licensee agrees that in the event a tax of any kind is imposed by any governmental entity as a direct result of a) the income received by the Licensor under this License, b) the use of the Licensed Property by the Licensee, or c) the installation of Licensee's equipment and structure, the Licensee shall pay such tax upon presentation of the appropriate documentation of said tax. Licensee shall have the right to contest the imposition of tax payable by the Licensor as a result of this License.  The Licensor will cooperate with the Licensee in the event the Licensee elects to contest any such tax.  The Licensor shall provide notice of such property tax assessment to the Licensee in a timely manner.

7. OPTION TO RENEW:  SPRINT shall have the option of renewing this License for two (2) successive periods of five (5) years each, upon the same terms and conditions which were in effect during the initial term, except as to the fee which shall be as stated below for the option term(s). SPRINT, in its sole discretion, may elect to exercise said renewal option(s) and the Licensor may not terminate this license should SPRINT elect to exercise said renewal option(s).

6

| Option Term(s) | Annual Fee |
|---|---|
| 1st | 5% above last annual fee |
| 2nd | 5% above last annual fee |

SPRINT shall exercise its option by giving Licensor written notice of its intention to exercise its option to renew at least sixty (60) days prior to the expiration of the initial term hereof, and if said renewal is for the successive period, SPRINT shall give to Licensor a like written notice at least sixty (60) days prior to the expiration of the then current period, of its intention to renew this License for and during the next succeeding period.

8. <u>LIABILITY INSURANCE:</u> SPRINT, and any agent or subcontractor entering the Premises on behalf of SPRINT, shall provide, during the term of this License, the following insurance with the customary coverage and exclusions:

Bodily Injury - $2,000,000 for all any one injury sustained by any one person in any one occurrence.

3,000,000 for damages as a result of any one accident.

Licensee shall name the Village of Bayville as an additional insured on Licensees Insurance policy. The Licensee shall provide Licensor with an <u>endorsement</u> to said effect and provide Licensor with a copy of the coverage page of said policy. The Licensor and Licensee release each other and their respective principals, officials, employees, representatives and agents, from any claims for damage to any person or the premises or to Licensee Facilities thereon caused by, or that result from, risks insured against under any insurance policies carried by the parties and in force at the time of any such damage. The Licensor shall provide proof of insurance to the Licensee at the Commencement Date of this License.

7

9.  CONDITION OF LICENSED PROPERTY:  Upon termination or expiration of this License, SPRINT shall surrender the Licensed Property to Licensor in good condition except for reasonable wear and tear.

10.  WARRANTY OF TITLE AND RIGHT TO LICENSE:

(a)  Licensee represents that it has examined the Licensed Property and any zoning requirements covering the Licensee's use of the Licensed Property.   Licensor makes no representations with respect to same, other than it knows of no reason why the Licensee's activities or structures would be prohibited.

(b)  In the event that the activities of the Licensee as permitted in this License are determined to be beyond the authority of the Licensor to permit, or are determined to be incompatible with the operation of a public water supply well site by the County of Nassau Board of Health or other agency having jurisdiction over the Licensor, then in that event, the Licensor shall be entitled to cancel this License and upon 90 days written notice, cause the Licensee to remove any equipment on the Licensed Property without any liability to the Licensor.  The Licensee shall have the right to defend, on behalf of itself and the Licensor, the rights granted in this License before any forum of competent jurisdiction.

11. NONEXCLUSIVE USE:  Licensor agrees that, from the date of execution of this License, it notify SPRINT of Licensor's intent to grant any other party any rights, or further right of access to the Licensed Property.  SPRINT agrees that the Licensor has the right to grant similar licenses to other parties, provided they do not interfere with Licensee's use.

12.  SPRINT'S RIGHT TO MAINTAIN SECURITY:  SPRINT, at its cost and expense, agrees to construct and maintain a fence with perma-hedge and/or landscaping around any

8

equipment structure housing SPRINT equipment, or undertake any other appropriate means to restrict access thereto. Said fence shall be of the same type and quality as existing fencing and shall be installed in a concrete mowing strip. The Licensor shall have the right to approve all plans for the installation of fencing, paving, shrubbery, and any other modification made to the Licensed Property.

13. <u>MAINTENANCE, REPAIRS, AND UTILITIES:</u> SPRINT shall perform all repairs necessary to keep its improvements on the Licensed Property and easements or other access to the property in good condition and repair. Licensor shall maintain the Property, other than SPRINT's improvements, in good condition and repair. SPRINT, at its sole expense, shall arrange for a separately metered electrical supply or other utilities and shall pay for all charges for electricity and other utilities consumed by SPRINT.

SPRINT agrees to paint all of its equipment attached to the water tank, and any marred surfaces created during installation or removal of SPRINT'S equipment, the same color as the section of the tank to which such equipment is affixed, using the same painting system presently on the Licensed Property and approved by the Licensor's engineers. To insure the accuracy of the color match, the Licensee agrees to employ a painting contractor selected by the Licensor.

14. <u>HAZARDOUS MATERIALS:</u> SPRINT agrees that it will not use, generate, store or dispose of any Hazardous Material, fuel of any kind, or any pesticides on, under, about or within the Licensed Property in violation of any law or regulation. SPRINT agrees to defend and hold harmless Licensor, Licensor's agents and employees against any and all losses, liabilities, claims and/or costs (including reasonable attorney's fees and costs) arising from any breach of any representation warranty or agreement of Licensee contained in this paragraph.

9

Licensor represents that no Hazardous Materials are used, or stored at or on the Licensed Property, except such materials suitable for treatment of drinking water, and further agrees that no such materials will be permitted on Licensor's property during the term of this License. Licensor agrees to defend and hold harmless Licensee, and Licensee's partners, affiliates, agents and employees against any and all losses, liabilities, claims and/or costs (including reasonable attorney's fees and costs) arising from any use, generation, storage or disposal of any Hazardous Materials on, under, about or within the Property in violation of any law or regulation, except to the exte██████, and not merely discovered by Licensee, Licensee's agents, contractors, representatives and/or employees. As used in this paragraph, "Hazardous Materials" shall mean petroleum ██ ██ petroleum product, asbestos, any substance, chemical or waste that is identified as hazardous, toxic or dangerous in any federal, state or local law or regulation. This paragraph shall survive the termination of this License.

15. <u>LICENSEE'S DEFAULT AND RIGHT TO CURE:</u> Each of the following shall be deemed a default by SPRINT and a breach of this License:

(a) Non-payment of fees, including any adjustments in fee amount as required hereunder, due hereunder for a period fifteen (15) days after receipt of written notice of such failure from Licensor.

(b) Failure to perform any other covenant for a period of thirty (30) days after receipt of such notice from Licensor specifying the failure. No such failure, however, shall be deemed to exist if SPRINT shall have commenced good faith efforts to rectify the same within such thirty (30) day period and provided such efforts shall be prosecuted to completion with reasonable diligence. Delay in rectifying the same shall be excused if due to causes beyond the reasonable control of

SPRINT.

(c) Any vacating or abandonment of the Licensed Property by SPRINT for more than three (3) consecutive months and the failure to pay the License Fee, unless ordered to do so by duly authorized legal authority or other cause beyond SPRINT's reasonable control.

(d) Licensee may terminate this License if Licensor shall be in default hereunder and such default is not cured within sixty (60) days of receipt of written notice of such default.

16. <u>ASSIGNMENT:</u> Licensee shall have the right to assign this License to any person or business entity which is authorized pursuant to and FCC licensed to operate a wireless communications business, is a parent, subsidiary or affiliate of Licensee, is merged or consolidated with Licensee or purchases more than 50% of either an ownership interest in Licensee or the assets of Licensee in the "Metropolitan Trading Area" (as such term is defined by the FCC) in which the property is located. Provided, however, the Licensee shall notify the Licensor in writing of the name and contact information of the assignee. Upon the notification to the Licensor, Licensee shall be relieved of all liabilities and obligations hereunder. Licensee may otherwise assign this License upon the written consent of the Licensor. Such consent shall not be unreasonably withheld providing Licensee is not in default of any of the terms and conditions of this License. Further, in the event the Licensee is entitled to any fee in excess of the fees provided for in this agreement, whether payable periodically or in a lump sum, the Licensor shall be entitled to 50% of such excess fee as additional compensation under this agreement. Licensor will require an assumption of this agreement at the time of any such assignment.

Notwithstanding anything to the contrary contained in this License, Licensee may assign, mortgage, pledge, hypothecate or otherwise transfer without consent its interest in this

11

Agreement to a financing entity, or agent on behalf of any financing entity to whom Licensee (i) has obligations for borrowed money or in respect of guaranties thereof, (ii) has obligations evidenced by bonds, debentures, notes, or similar instruments, or (iii) has obligations under or with respect to letters of credit, bankers acceptances and similar facilities or in respect of guaranties thereof.

17. <u>NOTICES:</u> Unless otherwise provided herein, any notice of demand required or permitted to be given hereunder shall be given in writing by certified or registered mail, return receipt requested, in a sealed envelope, postage prepaid, to be effective on the second day following, mailing addressed as follows:

|  |  |
|---|---|
| If to Licensor | Village of Bayville<br>34 School Street<br>Bayville, New York 11709 |
| If to Licensee | Sprint National Lease management<br>6391 Sprint Parkway<br>Mail Stop: KSOPHT0101-Z2650<br>Overland Park, Kansas 66251-2650 |

Either party hereto may change the place for the giving of notice to it by like written notice to the other.

18. <u>SEVERABILITY:</u> If any provision of this License shall be held to be invalid, illegal or unenforceable, the remaining provisions shall be binding upon the parties and shall be enforceable as though said invalid, illegal or unenforceable provision were not contained herein, provided, however, that if the invalid, illegal or unenforceable provision goes is material to this License, the License may be terminated, by either party on ten (10) days prior written notice to the other party hereto.

19. <u>AMENDMENT: WAIVER:</u> No revision of this License shall be valid unless

12

made in writing and signed by the parties hereto.  No provision may be waived except in writing signed by both parties.

20.  <u>BIND AND BENEFIT:</u>  All the conditions and covenants contained in this license shall inure to the benefit of and be binding upon the heirs, executors, administrators, successors, and permitted assigns of the parties hereto.

21. <u>RECORDING:</u> The parties agree that this License shall <u>not</u> be recorded or filed in the County Clerk's Office or with any other governmental agency.  The recording or filing of this License shall be a breach of this License by the recording or filing party.

22.  <u>ENTIRE AGREEMENT:</u>  This License and the exhibits attached hereto constitute the entire agreement of the parties hereto and shall supersede all prior offers, negotiations and agreements.

IN WITNESS WHEREOF, the parties have executed this license the date and year first above written.

BETHPAGE WATER DISTRICT    SPRINT
LICENSOR    LICENSEE


BY:_____    BY:_____


TITLE:_____    TITLE:_____

Date: March     , 2003    Date: March     , 2003

13

Sprint Site ID: NY33XC699-H/60261

**RECORDING REQUESTED BY:**

**WHEN RECORDED MAIL TO:**
 Sprint Spectrum Realty Company L.P.
Sprint Nextel Property Services
Site ID NY33XC699-H
Mailstop KSOPHT0101-Z2650
6391 Sprint Parkway
Overland Park, KS 66251-2650

[space above this line for Recorder's use]

**ATTACHMENT 1**
**TO**
**FIRST AMENDMENT TO LICENSE AGREEMENT**

<u>**MEMORANDUM OF AMENDMENT TO LICENSE AGREEMENT**</u>

THIS MEMORANDUM OF AMENDMENT TO LICENSE AGREEMENT ("Amended Memorandum"), by and between Village of Bayville, a municipal corporation ("Licensor") and Sprint Spectrum Realty Company L.P., a Delaware limited partnership, successor in interest to Sprint Spectrum L.P., a Delaware limited partnership ("Licensee"), evidences that the lease made and entered into by written License Agreement between Licensor and Licensee, dated April 23, 2003 ("Agreement"), has been amended by written agreement between the parties (the "Amendment"). Licensee's records reflect that a Memorandum of Agreement has not been filed of record and that Licensee has made no other public filings regarding the above-referenced Licensed Property ("Licensed Property"). In the event that any filings of record made by Licensee are discovered that encumber your title to the Licensed Property, Licensee agrees to cooperate in taking actions necessary to remove the encumbrance.

The Amendment provides in part that Licensor leases to Licensee certain real property owned by Licensor and located at north west corner of School House Road and Godfrey Avenue, also known as Section 29, Block 93, Lot 34, City of Bayville, County of Nassau, State of NY, together with non-exclusive utility and access easements (the "Licensed Property"). The Amendment grants Licensee the option to extend the Agreement for three (3) additional sixty (60) month terms after the expiration of the new initial sixty (60) month term which commenced on August 31, 2013.

**SIGNATURES ON FOLLOWING PAGE**

Licensor initials: _____

Licensee initials: _____

IN WITNESS WHEREOF, the parties have executed this Amended Memorandum as of the day and year indicated below.

**LICENSOR:**                                          **LICENSEE:**

Village of Bayville, a municipal corporation           Sprint Spectrum Realty Company L.P., a Delaware
                                                       limited partnership

By: *Victoria Siegel*                                  By: _____

Printed Name: _VICTORIA SIEGEL_                        Printed Name: ___Dan Butterworth___
                                                                        Site Development Manager

Title: _MAYOR_                                         Title: _____

Date: _11-22-06_                                       Date: _12/20/2006_

**EXHIBIT D**

**EXHIBIT D**

THIS LICENSE, made the 6 day of ~~April~~ May , 2004, by and between the VILLAGE OF BAYVILLE, a municipal corporation having an office at 34 School Street, Bayville, New York, hereinafter referred to as "Licensor", and, NEXTEL OF NEW YORK, INC. d/b/a/ Nextel Communications, a Delaware Corporation, having an office at 1 North Broadway White Plains, New York 10601, hereinafter referred to as "Licensee" or "NEXTEL".

**WHEREAS**, Licensor is the owner of certain real property described in Exhibit "1" annexed hereto; and

**WHEREAS**, NEXTEL desires to use a portion of said property and the elevated water tank (hereafter referred to as the "Licensed Property") for installation, maintenance and operation of a wireless communications facility and other associated equipment in connection with its providing of communications services;

**NOW, THEREFORE,** in consideration of all the foregoing, and in further consideration of the premises, obligations, terms and conditions hereinafter set forth and recited, both parties do hereby agree as follows:

1. PREMISES: Licensor grants to , the non-exclusive License to use that portion of the Property located at the north west corner of School House Road and Godfrey Avenue, Bayville, New York, also known as Section 29, Block 93, Lot 34, as specifically set forth and described in Exhibits LE-1, LE-2, and LE-3 attached hereto and referred to as the "Licensed Property". The rights granted to NEXTEL herein are irrevocable and may not be terminated except as provided for herein.

2. ACCESS TO PREMISES: Licensor grants the right of access to the Licensed Property to the Licensee. It is expressly understood and agreed, and Licensor acknowledges, that Licensee is entering into this License in reliance on the representation that , its officers, employees, agents, invitee, licensees, and representatives shall have the right of access to the

1

licensed premises through the real property of which the Licensed Property forms a part as specified below, during regular business hours. Any access to the Licensed Property other than during regular business hours of the Licensor shall be for emergency repair purposes only, unless prior agreement in writing from the Licensor is obtained by Licensee. Licensee agrees to mitigate noise during all repair operations performed at the Licensed Property.

3. <u>USE OF PREMISES:</u> (a) The Licensed Property is to be used for the installation, operation and maintenance of a wireless communications facility along with associated other electronic equipment which may be passive and/or active and no other purpose. Licensee shall have the right to install up to nine (9) antennas, fencing, equipment shelter as shown in a site plan attached hereto as Exhibit LE-3. The Initialing of Exhibit "LE-3" shall be deemed as Licensor's approval of antenna configuration and equipment placement. Other similar equipment shall be permitted by Licensor, providing such equipment placed by other licensees does not interfere with Licensee's transmissions.

All Licensee's equipment or other property attached to or otherwise brought onto the Licensed Property by shall at all times be personal property of NEXTEL and, at 's option, may be removed by at any time during the term or within a reasonable time after expiration of this License. Any damage caused by the Licensee as a result of the removal by of its equipment shall be repaired by the Licensee to the satisfaction of the Licensor. Licensee agrees to cooperate with the Licensor during water tank repainting by Licensor. Said cooperation shall include the repositioning of Licensee's equipment on Licensor's Property or temporary installation of a COW at a location mutually agreeable by the parties to accommodate the repainting process. Licensor shall give Licensee 30 days written notice if Licensee's equipment requires repositioning. Upon the completion of the repair or repainting process, the Licensee shall return to its previous position on the Licensed Property.

(b) Licensee shall have the right to use whatever appropriate means it deems appropriate to install its equipment, subject to the prior approval in writing of the engineer of the Licensor and consistent with the operation of the business of the Licensor. Licensor

2

acknowledges that in order for Licensee to install and operate its equipment, it will require the right to install and maintain transmission lines from the equipment shelter to the antenna location, install and maintain power from the main feed to the equipment shelter, and install and maintain telephone lines from the main telephone entry point to the equipment shelter.  Licensee shall have the right, subject to the approval of the Licensor, at any time during the term hereof, at its own expense, to erect, construct or make any improvements, alterations or additions upon or to the Licensed Property required by Licensee's use, including, but not limited to, the right of Licensee to enclose its equipment with fencing.  Except as provided elsewhere in this agreement, any such construction shall be subject to the building Code of the Village of Bayville and the approval of the engineer of the Licensor.  The Licensee agrees that the reasonable cost of the review of the site plan and construction plans, as well as construction supervision of Licensee's construction by the Village engineer, shall be paid for by the Licensee prior to plan approval and construction.  The Licensor agrees to act upon any construction request for approval within sixty days from the receipt of said request sent by certified mail, return receipt requested, to the office of the Licensor as provided in paragraph 16 of this agreement.  The Licensor shall have the right to select the exterior finish and color of Licensee's equipment structure.  Licensee shall provide asphalt pavement to its equipment shelter at 's expense.  The provisions of this subparagraph (b) shall not be construed to permit more than nine (9) antennas or more than one equipment shelter.

(c)  Licensee shall have the right at any time following the full execution of this License, at reasonable times during business hours, to enter upon the premises for the purpose of making appropriate engineering and boundary surveys, inspections and test borings and other tests to determine the appropriateness of the Premises for the installation of Licensee's equipment.  Due to security concerns, all entry onto the Licensor's Property and the conduct of any of the above mentioned tests or construction shall be required to receive the express prior permission of the Licensor.

Upon Licensee's request, at the expense of the Licensee, Licensor shall provide to the Licensee, to the extent available, copies of all structural drawings, surveys, of equipment and/or other information reasonably required in connection with Licensee's proposed installation

3

of its equipment at the Licensed Property.  Licensor shall cooperate with Licensee and will join

in any applications for governmental licenses, permits and approvals required of or deemed

necessary by Licensee for its use of the Licensed Property, including, without limitation,

applications for business licenses and permits and applications for zoning variances, zoning

ordinances amendments and special use permits, provided that Licensee shall reimburse and hold

Licensor harmless for any costs, fees or liability actually incurred by Licensor in connection with

such applications and approvals. Licensor agrees to assist the Licensee in any application for

zoning approvals that may be made to the Licensor pertaining to the Licensed Property.

       4.  <u>INTERFERENCE:</u>  (a)  Licensor agrees to eliminate, without cost to the

Licensee, any interference to Licensee's operation caused by Licensor or anyone holding under

Licensor in a timely manner after written notice thereof.  If such interference cannot be

eliminated within a reasonable length of time, Licensee's sole remedy shall be the right to

terminate this License, remove its equipment, and restore the Premises to its original condition.

Licensor grants to the Licensee the right and authority to enforce the obligations of other

licensees under similar paragraphs contained in license agreements with said licensees.

       (b)   Licensee agrees not to interfere with radio transmission or reception of other

communications equipment located prior to Licensee's installation, on the premises owned by

Licensor or other licensees of which the Licensed Property forms a part.  If Licensee should

cause such measurable interference, Licensee shall eliminate it in a timely manner.

       (c)  Licensor agrees not to erect any structure within or on the Property owned by

the Licensor of which the Licensed Property forms a part, or permit the future installation of

equipment which will result in technical interference problems with Licensee's then existing

equipment.

       (d)  The Licensee shall have the obligation to take all necessary steps to protect

Licensee's equipment during tank maintenance activities of the Licensor.

       5.  <u>TERM:</u>  The initial term of this License shall be for ten (10) years

commencing on the Commencement Date as defined in paragraph 6 below.  As used herein,

"term" refers to the initial term and any renewal term as herein provided.  If, at any time during

this License, the Licensed Property becomes unsuitable for a wireless communication facility due to: (a) governmental regulations, (b) interference with Licensee's operation that cannot be resolved, or (c) the discovery of the presence or imminent release of Hazardous Materials on the premises in violation of any law; then in the event of any of the above,  Licensee may terminate this License by giving notice to Licensor which shall be effective ninety (90) days after it is mailed by Licensee.  None of the above items of suitably shall be construed to permit termination of this License on account of a less expensive site than the Licensed Property becomes available to the Licensee.

      6.  <u>LICENSE FEE:</u> (a)  For the first year of this License, Licensee shall pay Licensor an annual fee of $45,600.00, payable in equal monthly installments of the sum of $3,800.00, in advance on the first day of each month, commencing on the start of construction on the Licensed Property, but no later than 30 days after the issuance of a building permit for the construction of the licensed facilities (hereinafter referred to as the "Commencement Date").  If the term commences on any day other than the first day of a calendar month, a pro rata fraction of a full month's fee shall be paid for the partial month at the commencement of said term.   If the term commences on any day other than the first day of a calendar month, a pro rata fraction of a full month's fee shall be paid for the partial month at the commencement of said term.

      (b)  <u>ESCALATION:</u>  On the annual anniversary date of each successive year of this License and any option to extend, the annual license fee shall increase at the rate of three percent (3%) per annum.

      (c)  <u>TAX ADJUSTMENT:</u>  The Licensee agrees that in the event real estate a taxes  are imposed by any governmental entity as a direct result of a) the income received by the Licensor under this License, b) the use of the Licensed Property by the Licensee, or c) the installation of Licensee's equipment and structure, the Licensee shall pay such real estate tax upon presentation of the appropriate documentation of said tax.  Licensee shall have the right to contest the imposition of tax payable by the Licensor as a result of this License.  The Licensor will cooperate with the Licensee in the event the Licensee elects to contest any such tax.  The Licensor shall provide notice of such property tax assessment to the Licensee in a timely manner.

7. <u>RIGHT TO RENEW:</u>   Licensee shall have the option of renewing this License for three (3) successive periods of five (5) years each, upon the same terms and conditions which were in effect during the initial term.  Licensee, in its sole discretion, may elect to exercise said renewal option(s) and the Licensor may not terminate this license should Licensee elect to exercise said renewal option(s). Licencee shall exercise its option by giving Licensor written notice of its intention to exercise its option to renew at least sixty (60) days prior to the expiration of the initial term hereof, and if said renewal is for the successive period, Licensee shall give to Licensor a like written notice at least sixty (60) days prior to the expiration of the then current period, of its intention to renew this License for and during the next succeeding period.

8. <u>LIABILITY INSURANCE:</u> Licensee, and any agent or subcontractor entering the Premises on behalf of Licensee, shall provide, during the term of this License, the following insurance with the customary coverage and exclusions:

Bodily Injury - $2,000,000 for all any one injury sustained by any one person in any one occurrence.

$5,000,000 for damages as a result of any one accident.
Licensee shall name the Village of Bayville as an additional insured on Licensee's Insurance policy.  The Licensee shall provide Licensor with an <u>endorsement</u> to said effect and provide Licensor with a copy of the coverage page of said policy.   The Licensor shall provide proof of insurance to the Licensee at the Commencement Date of this License.

Licensor and Licensee each indemnifies and agrees to defend the other against, and hold the other harmless from any and all costs, including reasonable attorney's fees and claim of liability or loss which may arise out of the ownership, use and occupancy of the Property by the indemnifying party.  This indemnity does not apply to any claims arising from the negligence  or intentional misconduct of the indemnified party.  The indemnity obligations under this section shall survive the termination of this License.

9. <u>CONDITION OF LICENSED PROPERTY:</u>  Upon termination or expiration of this License, Licensee shall surrender the Licensed Property to Licensor in good condition

except for reasonable wear and tear.

10. <u>WARRANTY OF TITLE AND RIGHT TO LICENSE:</u>

(a) Licensee represents that it has examined the Licensed Property and any zoning requirements covering the Licensee's use of the Licensed Property. Licensor makes no representations with respect to same, other than it knows of no reason why the Licensee's activities or structures would be prohibited.

(b) In the event that the activities of the Licensee as permitted in this License are determined to be beyond the authority of the Licensor to permit, or are determined to be incompatible with the operation of a public water supply well site by the County of Nassau Board of Health or other agency having jurisdiction over the Licensor, then in that event, the Licensor shall be entitled to cancel this License and upon 90 days written notice, cause the Licensee to remove any equipment on the Licensed Property without any liability to the Licensor. The Licensee shall have the right to defend, on behalf of itself and the Licensor, the rights granted in this License before any forum of competent jurisdiction.

11. <u>NONEXCLUSIVE USE:</u> Licensor agrees that, from the date of execution of this License that Licensor may grant any to other parties any rights, or further right of access to the Licensed Property. Licensee agrees that the Licensor has the right to grant similar licenses to other parties, provided they do not interfere with Licensee's use.

12. <u>LICENSEE'S RIGHT TO MAINTAIN SECURITY:</u> Licensee, at its cost and expense, agrees to construct and maintain a fence with perma-hedge and/or landscaping around any equipment structure housing Licensee's equipment, or undertake any other appropriate means to restrict access thereto. Said fence shall be of the same type and quality as existing fencing and shall be installed in a concrete mowing strip. The Licensor shall have the right to approve all plans for the installation of fencing, paving, shrubbery, and any other modification made to the Licensed Property.

13. <u>MAINTENANCE, REPAIRS, AND UTILITIES:</u> Licensee shall perform all repairs necessary to keep its improvements on the Licensed Property and easements or other access to the property in good condition and repair. Licensor shall maintain the Property, other

7

than Licensee's improvements, in good condition and repair. Licensee, at its sole expense, shall arrange for a separately metered electrical supply or other utilities and shall pay for all charges for electricity and other utilities consumed by Licensee.

Licensee agrees to paint all of its equipment attached to the water tank, and any marred surfaces created during installation or removal of Licensee's equipment, the same color as the section of the tank to which such equipment is affixed, using the same painting system presently on the Licensed Property and approved by the Licensor's engineers. To insure the accuracy of the color match, the Licensee agrees to employ a painting contractor selected by the Licensor.

14. <u>HAZARDOUS MATERIALS:</u>  Licensee agrees that it will not use, generate, store or dispose of any Hazardous Material, fuel of any kind, or any pesticides on, under, about or within the Licensed Property in violation of any law or regulation. Licensee agrees to defend and hold harmless Licensor, Licensor's agents and employees against any and all losses, liabilities, claims and/or costs (including reasonable attorney's fees and costs) arising from any breach of any representation warranty or agreement of Licensee contained in this paragraph.

Licensor represents that no Hazardous Materials are used, or stored at or on the Licensed Property, except such materials suitable for treatment of drinking water, and further agrees that no such materials will be permitted on Licensor's property during the term of this License. Licensor agrees to defend and hold harmless Licensee, and Licensee's partners, affiliates, agents and employees against any and all losses, liabilities, claims and/or costs (including reasonable attorney's fees and costs) arising from any use, generation, storage or disposal of any Hazardous Materials on, under, about or within the Property in violation of any law or regulation, except to the extent caused, and not merely discovered by Licensee, Licensee's agents, contractors, representatives and/or employees. As used in this paragraph, "Hazardous Materials" shall mean petroleum or any petroleum product, asbestos, any substance, chemical or waste that is identified as hazardous, toxic or dangerous in any federal, state or local law or regulation. This paragraph shall survive the termination of this License.

15. <u>LICENSEE'S DEFAULT AND RIGHT TO CURE:</u> Each of the following

8

shall be deemed a default by Licensor and a breach of this License:

(a) Non-payment of fees, including any adjustments in fee amount as required hereunder, due hereunder for a period fifteen (15) days after receipt of written notice of such failure from Licensor.

(b) Failure to perform any other covenant for a period of thirty (30) days after receipt of such notice from Licensor specifying the failure. No such failure, however, shall be deemed to exist if Licensee shall have commenced good faith efforts to rectify the same within such thirty (30) day period and provided such efforts shall be prosecuted to completion with reasonable diligence. Delay in rectifying the same shall be excused if due to causes beyond the reasonable control of Licensee.

(c) Any vacating or abandonment of the Licensed Property by Licensee for more than three (3) consecutive months and the failure to pay the License Fee, unless ordered to do so by duly authorized legal authority or other cause beyond Licensee's reasonable control.

(d) Licensee may terminate this License if Licensor shall be in default hereunder and such default is not cured within sixty (60) days of receipt of written notice of such default.

16. <u>ASSIGNMENT</u>: Licensee shall have the right to assign this License to any person or business entity which is authorized pursuant to and FCC licensed to operate a wireless communications business, is a parent, subsidiary or affiliate of Licensee, is merged or consolidated with Licensee or purchases more than 50% of either an ownership interest in Licensee or the assets of Licensee in the "Metropolitan Trading Area" (as such term is defined by the FCC) in which the property is located. Provided, however, the Licensee shall notify the Licensor in writing of the name and contact information of the assignee. Upon the notification to the Licensor, Licensee shall be relieved of all liabilities and obligations hereunder. Licensee may otherwise assign this License upon the written consent of the Licensor. Such consent shall not be unreasonably withheld providing Licensee is not in default of any of the terms and conditions of this License. Further, in the event the Licensee assignor is entitled to any fee paid by the assignor in excess of the fees provided for in this agreement, whether payable periodically or in a lump sum, the Licensor shall be entitled to 50% of such excess fee as additional

compensation under this agreement.  Licensor will require an assumption of this agreement at the time of any such assignment.

Notwithstanding anything to the contrary contained in this License, Licensee may assign, mortgage, pledge, hypothecate or otherwise transfer without consent its interest in this Agreement to a financing entity, or agent on behalf of any financing entity to whom Licensee (i) has obligations for borrowed money or in respect of guaranties thereof, (ii) has obligations evidenced by bonds, debentures, notes, or similar instruments, or (iii) has obligations under or with respect to letters of credit, bankers acceptances and similar facilities or in respect of guaranties thereof.

17. <u>NOTICES:</u>  Unless otherwise provided herein, any notice of demand required or permitted to be given hereunder shall be given in writing by certified or registered mail, return receipt requested, in a sealed envelope, postage prepaid, to be effective on the second day following, mailing addressed as follows:

|  |  |
|---|---|
| If to Licensor | Village of Bayville<br>34 School Street<br>Bayville, New York 11709 |
| If to Licensee | Nextel Communications, Inc.<br>1 North Broadway<br>White Plains, NY 10601 |
| and | Nextel Communications, Inc.<br>2001 Edmund Halley Drive<br>Reston, VA 20191-3436<br>Second Floor Mail Stop 2E225<br>Attn: Site Leasing Services, Contracts |

Either party hereto may change the place for the giving of notice to it by like written notice to the other.

18. <u>WAIVER OF LIEN:</u>

(a)     Licensor waives any lien rights it may have concerning the Licensee Facilities, all of which are deemed Licensee's personal property and not fixtures, and Licensee has the right to remove the same at any time without Licensor's consent in accordance with the terms of this License.

(b)     Licensor acknowledges that Licensee has entered into a financing

10

arrangement including promissory notes and financial and security agreements for the financing of the Licensee Facilities ("Collateral") with a third party financing entity (and may in the future enter into additional financing arrangements with other financing entities). In connection therewith, Licensor (i) consents to the installation of the Collateral; (ii) disclaims any interest in the Collateral, as fixtures or otherwise; and (iii) agrees that the Collateral shall be exempt from execution, foreclosure, sale, levy, attachment, or distress for any fees due or to become due and that such Collateral may be removed at any time without recourse to legal proceedings.

19. SEVERABILITY: If any provision of this License shall be held to be invalid, illegal or unenforceable, the remaining provisions shall be binding upon the parties and shall be enforceable as though said invalid, illegal or unenforceable provision were not contained herein, provided, however, that if the invalid, illegal or unenforceable provision goes is material to this License, the License may be terminated, by either party on ten (10) days prior written notice to the other party hereto.

20. AMENDMENT; WAIVER: No revision of this License shall be valid unless made in writing and signed by the parties hereto. No provision may be waived except in writing signed by both parties.

21. BIND AND BENEFIT: All the conditions and covenants contained in this license shall inure to the benefit of and be binding upon the heirs, executors, administrators, successors, and permitted assigns of the parties hereto.

22. RECORDING: The parties agree that this License shall not be recorded or filed in the County Clerk's Office or with any other governmental agency. The recording or filing of this License shall be a breach of this License by the recording or filing party.

23. ENTIRE AGREEMENT: This License and the exhibits attached hereto constitute the entire agreement of the parties hereto and shall supersede all prior offers, negotiations
and agreements.

IN WITNESS WHEREOF, the parties have executed this license the date and year first above written.

11

VILLAGE OF BAYVILLE
LICENSOR

NEXTEL COMMUNICATIONS, INC.
LICENSEE

BY: _Victoria Siegel_

BY: _____

TITLE: _Mayor_

TITLE: V.P. Site Development, Northeast Region

Date: May 6, 2004

Date: April 2004

12

**EXHIBIT E**

## LICENSE AGREEMENT

THIS LICENSE, made the    day of February, 2003, by and between the VILLAGE OF BAYVILLE, a municipal corporation, having an office at 34 School Street, Bayville, New York, hereinafter referred to as "Licensor", and,    OMNIPOINT FACILITIES NETWORK 2, LLC, a Limited Liability Company, having an office at c/o 4 Sylvan Way, Parsippany, New Jersey 07054, hereinafter referred to as "Licensee" or "OFN2".

**WHEREAS,** Licensor is the owner of certain real property described in Exhibit "1" annexed hereto; and

**WHEREAS,** OFN2 desires to use a portion of said property and the elevated water tank (hereafter referred to as the "Licensed Property") for installation, maintenance and operation of a wireless communications facility and other associated equipment in connection with its providing of communications services;

**NOW, THEREFORE,** in consideration of all the foregoing, and in further consideration of the premises, obligations, terms and conditions hereinafter set forth and recited, both parties do hereby agree as follows:

1. <u>PREMISES:</u>  Licensor grants to OFN2 the exclusive License to use that portion of the Property located at                    , Bayville, New York, as specifically set forth and described in Exhibit "2" attached hereto and referred to as the "Licensed Property".

2. <u>ACCESS TO PREMISES:</u>  Licensor grants OFN2 the right of access to the Licensed Property.  It is expressly understood and agreed, and Licensor acknowledges, that OFN2 is entering into this License in reliance on the representation that OFN2, its officers, employees,

1

agents, invitees, licensees, and representatives shall have the right of access to the licensed premises through the real property of which the Licensed Property forms a part as specified below, during regular business hours. Any access to the Licensed Property other than during regular business hours of the Licensor shall be for emergency repair purposes only, unless prior agreement in writing from the Licensor is obtained by OFN2. OFN2 agrees to mitigate noise during all repair operations performed at the Licensed Property.

3. <u>USE OF PREMISES:</u> (a) The Licensed Property is to be used for the installation, operation and maintenance of a wireless communications facility along with associated other electronic equipment which may be passive and/or active and for no other purpose. OFN2 shall have the right to install up to nine (9) antennas, fencing, and equipment shelter as shown on a site plan attached hereto as Exhibit 3. The Initialing of Exhibit "3" shall be deemed as Licensor's approval of antenna configuration and equipment placement. Other similar equipment shall be permitted by Licensor, providing such equipment placed by other licensees does not interfere with Licensee's transmissions.

All Licensee's equipment or other property attached to or otherwise brought onto the Licensed Property by OFN2 shall at all times be personal property of OFN2 and, at OFN2's option, may be removed by OFN2 at any time during the term or within a reasonable time after expiration of this License. Any damage caused by the Licensee to the property of the Licensor as a result of the removal by OFN2 of its equipment shall be repaired by the Licensee to the condition prior to the damage.

OFN2 agrees to cooperate with the Licensor during water tank repainting by Licensor. Said cooperation shall include the repositioning of OFN2's equipment on Licensor's Property to

accommodate the repainting process. Licensor shall give Licensee 30 days written notice if Licensee's equipment requires repositioning. Upon the completion of the repair or repainting process, the Licensee shall return to its previous position on the Licensed Property. Any interruption in service shall result in an License fee abatement during the repair and repainting process.

(b) OFN2 shall have the right to use whatever appropriate means it deems appropriate to install its equipment, subject to the prior approval in writing of the engineer of the Licensor and consistent with the operation of the business of the Licensor. Licensor acknowledges that in order for OFN2 to install and operate its equipment, it will require the right to install and maintain transmission lines from the equipment shelter to the antenna location, install and maintain power from the main feed to the equipment shelter, and install and maintain telephone lines from the main telephone entry point to the equipment shelter. OFN2 shall have the right, subject to the approval of the Licensor, at any time during the term hereof, at its own expense, to erect, construct or make any improvements, alterations or additions upon or to the Licensed Property required by OFN2's use, including, but not limited to, the right of OFN2 to enclose its equipment with fencing. Except as provided elsewhere in this agreement, any such construction shall be subject to the Building Code of the Village of Bayville and the approval of the engineer of the Licensor. The Licensee agrees that the cost of the review of the site plan and construction plans, as well as construction supervision of Licensee's construction by the Village engineer, shall be paid for by the Licensee prior to plan approval and construction. The Licensor agrees to act upon any construction request for approval within sixty (60) days from the receipt of said request sent by certified mail, return receipt requested, to the office of the Licensor as provided in paragraph "16" of this agreement. The Licensor shall have the right to select the exterior finish and color of OFN2's equipment structure. OFN2 shall

3

provide asphalt pavement to its equipment shelter at OFN2's expense.  The provisions of this subparagraph (b) shall not be construed to permit more than nine (9) antennas or more than one equipment shelter.

(c) Licensee shall have the right at any time following the full execution of this License, at reasonable times during business hours, to enter upon the premises for the purpose of making appropriate engineering and boundary surveys, inspections and test borings and other tests to determine the appropriateness of the Premises for the installation of Licensee's equipment.  Due to increased security concerns, all entry onto the Licensor's Property and the conduct of any of the above-mentioned tests or construction shall be required to receive the express prior permission of the Licensor.

Upon Licensee's request, at the expense of the Licensee, Licensor shall provide to the Licensee, to the extent available, copies of all structural drawings, surveys, of equipment and/or other information reasonably required in connection with Licensee's proposed installation of its equipment at the Licensed Property.  Licensor shall cooperate with OFN2 and will join in any applications for governmental licenses, permits and approvals required of or deemed necessary by OFN2 for its use of the Licensed Property, including, without limitation, applications for business licenses and permits and applications for zoning variances, zoning ordinances amendments and special use permits, provided that OFN2 shall reimburse and hold Licensor harmless for any costs, fees or liability actually incurred by Licensor in connection with such applications and approvals.  The Licensor believes that the Village Zoning Ordinance is not applicable to the construction and use provided for herein.  The above provisions notwithstanding, Licensor agrees to assist the Licensee in any application for zoning approvals that may be made to the Licensor pertaining to the

4

Licensed Property.

4. <u>INTERFERENCE:</u> (a) Licensor agrees to eliminate, without cost to the Licensee, any interference to OFN2's operation caused by Licensor or anyone holding under Licensor in a timely manner after oral and written notice thereof. If such interference cannot be eliminated within a reasonable length of time, Licensee's sole remedy shall be the right to terminate this License, remove its equipment, and restore the Premises to its original condition.

(b)  OFN2 agrees not to interfere with radio transmission or reception of other communications equipment properly functioning, prior to Licensee's installation, on the premises owned by Licensor or other licensees of which the Licensed Property forms a part. If OFN2 should cause such measurable interference, OFN2 shall eliminate it in a timely manner.

(c)  Licensor agrees not to erect any structure within or on the Property owned by the Licensor of which the Licensed Property forms a part, or permit the future installation of equipment which will result in technical interference problems with Licensee's then existing equipment.

(d)  The Licensee shall have the obligation to take all necessary steps to protect Licensee's equipment during tank maintenance activities of the Licensor.

5. <u>TERM:</u> The initial term of this License shall be for ten (10) years commencing on the Commencement Date as defined in paragraph "6" below. As used herein, "term" refers to the initial term and any renewal term as herein provided.  If, at any time during this License, the Licensed Property becomes unsuitable for a wireless communication facility due to: (a) governmental regulations, or (b) interference with OFN2's operation that cannot be resolved; then in either event, OFN2 may terminate this License by giving notice to Licensor which shall be effective one hundred twenty (120) days after it is mailed by OFN2.  None of the above items of

5

*suitably* shall be construed to permit termination of this License on account of a less expensive site than the Licenses Property becomes available to the Licensee.

   6. <u>LICENSE FEE:</u> (a) For the first year of this License, OFN2 shall pay Licensor an annual fee of $45,600.00, payable in equal monthly installments of the sum of $3,800.00, in advance on the first day of each month, commencing on the start of construction on the Licensed Property, but no later than March 1, 2003 (hereinafter referred to as the "Commencement Date"). If the term commences on any day other than the first day of a calendar month, a pro rata fraction of a full month's fee shall be paid for the partial month at the commencement of said term.

   (b) <u>ESCALATION:</u> On the annual anniversary date of each successive year of this License and any option to extend, the annual license fee shall increase at the rate of four percent (4%) per annum.

   (c) <u>TAX ADJUSTMENT:</u> The Licensee agrees that in the event a tax of any kind is imposed by any governmental entity as a direct result of a) the income received by the Licensor under this License, b) the use of the Licensed Property by the Licensee, or c) the installation of Licensee's equipment and structure, the Licensee shall reimburse Licensor for such tax upon presentation of the appropriate documentation of Licensor's payment of said tax. Licensee shall have the right to contest the imposition of tax payable by the Licensor as a result of this License. The Licensor will cooperate with the Licensee in the event the Licensee elects to contest any such tax. The Licensor shall provide notice of such property tax assessment to the Licensee in a timely manner.

   7. <u>OPTION TO RENEW:</u> OFN2 shall have the option of renewing this License for two (2) successive periods of five (5) years each, upon the same terms and conditions which were

6

in effect during the initial term, except as to the fee which shall be as stated below for the option term(s).  OFN2, in its sole discretion, may elect to exercise said renewal option(s) and the Licensor may not terminate this license should OFN2 elect to exercise said renewal option(s).

| Option Term(s) | Annual Fee |
|---|---|
| 1st | 5% above last annual fee |
| 2nd | 5% above last annual fee |

OFN2 shall exercise its option by giving Licensor written notice of its intention to exercise its option to renew at least sixty (60) days prior to the expiration of the initial term hereof, and if said renewal is for the successive period, OFN2 shall give to Licensor a like written notice at least sixty (60) days prior to the expiration of the then current period, of its intention to renew this License for and during the next succeeding period.

8.  LIABILITY INSURANCE:  OFN2, and any agent or subcontractor entering the Premises on behalf of OFN2, shall provide, during the term of this License, the following insurance with the customary coverage and exclusions:

Bodily Injury - $2,000,000 for all any one injury sustained by any one person in any one occurrence.

$5,000,000 for damages as a result of any one accident.

Licensee shall name the Village of Bayville as an additional insured on Licensee's Insurance policy. The Licensee shall provide Licensor with an endorsement to said effect and provide Licensor with a copy of the coverage page of said policy.  The Licensor and Licensee release each other and their respective principals, officials, employees, representatives and agents, from any claims for damage

7

to any person or the premises or to Licensee Facilities thereon caused by, or that result from, risks insured against under any insurance policies carried by the parties and in force at the time of any such damage. The Licensor shall provide proof of insurance to the Licensee at the Commencement Date of this License.

     9.  <u>CONDITION OF LICENSED PROPERTY</u>:  Upon termination or expiration of this License, OFN2 shall surrender the Licensed Property to Licensor in good condition except for reasonable wear and tear.

     10.  <u>WARRANTY OF TITLE AND RIGHT TO LICENSE</u>:

     (a)  Licensee represents that it has examined the condition of the title to the Licensed Property and any zoning requirements covering the Licensee's use of the Licensed Property. Licensor makes no representations with respect to same, other than it knows of no reason why the Licensee's activities or structures would be prohibited.

     (b)  In the event that the activities of the Licensee as permitted in this License are determined to be beyond the authority of the Licensor to permit, or are determined to be incompatible with the operation of a public water supply well site by the County of Nassau Board of Health or other agency having jurisdiction over the Licensor, then in that event, the Licensor shall be entitled to cancel this License and upon 90 days written notice, cause the Licensee to remove any equipment on the Licensed Property without any liability to the Licensor.  The Licensee shall have the right to defend, on behalf of itself and the Licensor, the rights granted in this License before any forum of competent jurisdiction.

     11.  <u>NONEXCLUSIVE USE</u>:  Licensor agrees that, from the date of execution of this License, it notify OFN2 of Licensor's intent to grant any other party any rights, or further right of

8

access to the Licensed Property. OFN2 agrees that the Licensor has the right to grant similar licenses to other parties, provided they do not interfere with Licensee's use or occupation of the demised premises. .

12. OFN2'S RIGHT TO MAINTAIN SECURITY: OFN2, at its cost and expense, agrees to construct and maintain a fence with perma-hedge and/or landscaping around any equipment structure housing OFN2 equipment, or undertake any other appropriate means to restrict access thereto. Said fence shall be of the same type and quality as existing fencing and shall be installed in a concrete mowing strip. The Licensor shall have the right to approve all plans for the installation of fencing, paving, shrubbery, and any other modification made to the Licensed Property.

13. MAINTENANCE, REPAIRS, AND UTILITIES: OFN2 shall perform all repairs necessary to keep its improvements on the Licensed Property and easements or other access to the property in good condition and repair. Licensor shall maintain the Property, other than OFN2's improvements, in good condition and repair. OFN2, at its sole expense, shall arrange for a separately metered electrical supply or other utilities and shall pay for all charges for electricity and other utilities consumed by OFN2.

OFN2 agrees to paint all of its equipment attached to the water tank, and any marred surfaces created during installation or removal of OFN2'S equipment, the same color as the section of the tank to which such equipment is affixed, using the same painting system presently on the Licensed Property and approved by the Licensor's engineers. To insure the accuracy of the color match, the Licensee agrees to employ a painting contractor selected by the Licensor.

14. HAZARDOUS MATERIALS: OFN2 agrees that it will not use, generate, store or dispose of any Hazardous Material, fuel of any kind, or any pesticides on, under, about or within

9

the Licensed Property in violation of any law or regulation. OFN2 agrees to defend and hold harmless Licensor, Licensor's agents and employees against any and all losses, liabilities, claims and/or costs (including reasonable attorney's fees and costs) arising from any breach of any representation warranty or agreement of Licensee contained in this paragraph.

Licensor represents that no Hazardous Materials are used, or stored at or on the Licensed Property, except such materials suitable for treatment of drinking water, and further agrees that no such materials will be permitted on Licensor's property during the term of this License. Licensor agrees to defend and hold harmless Licensee, and Licensee's partners, affiliates, agents and employees against any and all losses, liabilities, claims and/or costs (including reasonable attorney's fees and costs) arising from any use, generation, storage or disposal of any Hazardous Materials on, under, about or within the Property in violation of any law or regulation, except to the extent caused, and not merely discovered by Licensee, Licensee's agents, contractors, representatives and/or employees. As used in this paragraph, "Hazardous Materials" shall mean petroleum or any petroleum product, asbestos, any substance, chemical or waste that is identified as hazardous, toxic or dangerous in any federal, state or local law or regulation. This paragraph shall survive the termination of this License.

15. <u>LICENSEE'S DEFAULT AND RIGHT TO CURE:</u> Each of the following shall be deemed a default by OFN2 and a breach of this License:

(a) Non-payment of fees, including any adjustments in fee amount as required hereunder, due hereunder for a period fifteen (15) days after receipt of written notice of such failure from Licensor.

(b) Failure to perform any other covenant for a period of thirty (30) days after receipt

10

of such notice from Licensor specifying the failure. No such failure, however, shall be deemed to exist if OFN2 shall have commenced good faith efforts to rectify the same within such thirty (30) day period and provided such efforts shall be prosecuted to completion with reasonable diligence. Delay in rectifying the same shall be excused if due to causes beyond the reasonable control of OFN2.

(c)  Any vacating or abandonment of the Licensed Property by OFN2 for more than three (3) consecutive months and the failure to pay the License Fee, unless ordered to do so by duly authorized legal authority or other cause beyond OFN2's reasonable control.

(d)  Licensee may terminate this License if Licensor shall be in default hereunder and such default is not cured within sixty (60) days of receipt of written notice of such default.

16.  <u>ASSIGNMENT:</u>  Licensee shall have the right to assign this License to any person or business entity which is authorized pursuant to and FCC licensed to operate a wireless communications business, is a parent, subsidiary or affiliate of Licensee, is merged or consolidated with Licensee or purchases more than 50% of either an ownership interest in Licensee or the assets of Licensee in the "Metropolitan Trading Area" (as such term is defined by the FCC) in which the property is located. Provided, however, the Licensee shall notify the Licensor in writing of the name and contact information of the assignee. Upon the notification to the Licensor, Licensee shall be relieved of all liabilities and obligations hereunder. Licensee may otherwise assign this License upon the written consent of the Licensor. Such consent shall not be unreasonably withheld providing Licensee is not in default of any of the terms and conditions of this License. Further, in the event the Licensee is entitled to any fee in excess of the fees provided for in this agreement, whether payable periodically or in a lump sum, the Licensor shall be entitled to 50% of such excess fee as

11

additional compensation under this agreement. Licensor will require an assumption of this agreement at the time of any such assignment.

Notwithstanding anything to the contrary contained in this License, Licensee may assign, mortgage, pledge, hypothecate or otherwise transfer without consent its interest in this Agreement to a financing entity, or agent on behalf of any financing entity to whom Licensee (i) has obligations for borrowed money or in respect of guaranties thereof, (ii) has obligations evidenced by bonds, debentures, notes, or similar instruments, or (iii) has obligations under or with respect to letters of credit, bankers acceptances and similar facilities or in respect of guaranties thereof.

17. <u>NOTICES:</u> Unless otherwise provided herein, any notice of demand required or permitted to be given hereunder shall be given in writing by certified or registered mail, return receipt requested, in a sealed envelope, postage prepaid, to be effective on the second day following, mailing addressed as follows:

| If to Licensor | Village of Bayville |
| | 34 School Street |
| | Bayville, New York 11709 |

| If to Licensee | Omnipoint Facilities Network 2, LLC |
| | 4 Sylvan Way |
| | Parsippany, NJ 07054 |

Omnipoint Facilities Network 2, LLC
12920 SE 38th Street
Bellavue, WA 98006

Either party hereto may change the place for the giving of notice to it by like written notice to the other.

18. <u>SEVERABILITY:</u> If any provision of this License shall be held to be invalid, illegal or unenforceable, the remaining provisions shall be binding upon the parties and shall be

12

enforceable as though said invalid, illegal or unenforceable provision were not contained herein, provided, however, that if the invalid, illegal or unenforceable provision goes is material to this License, the License may be terminated, by either party on ten (10) days prior written notice to the other party hereto.

19.  AMENDMENT: WAIVER:  No revision of this License shall be valid unless made in writing and signed by the parties hereto.  No provision may be waived except in writing signed by both parties.

20.  BIND AND BENEFIT:  All the conditions and covenants contained in this license shall inure to the benefit of and be binding upon the heirs, executors, administrators, successors, and permitted assigns of the parties hereto.

21.  RECORDING:  The parties agree that this License shall not be recorded or filed in the County Clerk's Office or with any other governmental agency.  The recording or filing of this License shall be a breach of this License by the recording or filing party.

22.  ENTIRE AGREEMENT:  This License and the exhibits attached hereto constitute the entire agreement of the parties hereto and shall supersede all prior offers, negotiations and agreements.

IN WITNESS WHEREOF, the parties have executed this license the date and year first above written.

VILLAGE OF BAYVILLE                 OMNIPOINT FACILITIES NETWORK 2, LLC
LICENSOR                            LICENSEE

BY:_____            BY:_____

TITLE:_____            TITLE:_____
Date: March    , 2003               Date: March    , 2003

13

**Exhibit F**

COPY

## OPTION AND LEASE AGREEMENT

This Agreement, made this 10ᵗʰ day of *March*, 1992, between the Village of Bayville, a municipal corporation having offices at 34 School Street, Bayville, New York 11709 (hereinafter referred to as Lessor), and New York SMSA Limited Partnership, a Delaware limited partnership in which New York Cellular Geographic Service Area, Inc., a subsidiary of NYNEX Mobile Communications Company, is the General Partner, having its principal offices at 2000 Corporate Drive, Orangeburg, New York 10962 (hereinafter referred to as Tenant).

### OPTION AGREEMENT

WHEREAS Lessor is the owner of certain real property and a water tank (hereinafter referred to as the Tower) constructed thereon and located at 34 School Street, Bayville, New York; and

WHEREAS Tenant desires to obtain an option to lease space on the Tower for the purpose of installing, maintaining and operating an antenna array of up to fifteen antennas and associated transmission lines and mounting apparatus, and to lease a portion of said real property consisting of approximately 400 square feet for the purpose of constructing, maintaining and operating a mobile communications facility, consisting of an equipment building of approximately 312 square feet to be constructed by Tenant on the premises, with a right of way for access thereto, an easement for utilities, and the right to install and maintain wires, cables and necessary connections between the equipment Tenant will install in the equipment building and the antenna array, all as substantially shown on Exhibits "A" and "B", attached hereto and made a part hereof.

NOW, THEREFORE, in consideration of the sum of Five Hundred Dollars ($500.00), hereinafter referred to as the Option Money, paid by Tenant to Lessor

upon execution of this Agreement by both parties, Lessor grants to Tenant the option to lease said Tower space and property, including a right of way for access thereto, seven days a week, twenty-four hours a day, for the installation and maintenance of its facility as herein described, for the term and in accordance with the Lease Agreement and its covenants and conditions set forth therein.

This option may be exercised at any time on or prior to September 30, 1992. The time during which the option may be exercised may be extended by Tenant for six months through March 31, 1993, by Tenant giving Lessor written notice of said extension not later than September 30, 1992, and the payment by Tenant to Lessor of an additional                    Option Money. If during the option period Lessor decides to sell the subject premises or the Tower or make alterations thereto, Lessor shall immediately notify Tenant in writing so that Tenant may take steps necessary to protect Tenant's interest in the property. Any sale or alteration, however, shall be subject and subordinate to the terms of this Agreement.

This Agreement may be sold, assigned or transferred at any time without the consent of Lessor to a partnership or corporation having a general partner or a controlling shareholder, respectively, which is a subsidiary or affiliate of NYNEX Mobile Communications Company. As to other parties, this Agreement may not be sold, assigned or transferred without the written consent of Lessor, such consent not to be unreasonably withheld or delayed.

Should Tenant fail to exercise its option within the time herein limited, all rights and privileges granted hereunder shall be deemed completely surrendered, this option terminated, and Lessor shall retain all Option Money, and no additional money shall be payable by either party to the other. Should Tenant exercise its option, no part of any Option Money shall be applied toward the rent.

Lessor shall grant Tenant, during the option period and with advance

-2-

notification, ingress and egress to the premises to conduct engineering tests and other activities of similar nature as Tenant may deem necessary, at the sole cost of Tenant.

Lessor agrees to execute a Memorandum of Agreement, to be prepared by Tenant, if requested by Tenant, which Memorandum of Agreement may be recorded by Tenant at Tenant's expense.

This Agreement and the performance hereunder shall be governed, interpreted, construed and regulated by the laws of the State of New York.

If Tenant exercises the option, notice of such exercise shall be given by Tenant to Lessor in writing by certified mail, return receipt requested. Notice shall be deemed effective on the date it is posted. On the first day of the month following the giving of such notice, the following Lease Agreement shall become effective.

### LEASE AGREEMENT

This Agreement, made between the Village of Bayville, a municipal corporation having offices at 34 School Street, Bayville, New York 11709 (hereinafter referred to as Lessor), and New York SMSA Limited Partnership, a Delaware limited partnership in which New York Cellular Geographic Service Area, Inc., a subsidiary of NYNEX Mobile Communications Company, is the General Partner, having its principal offices at 2000 Corporate Drive, Orangeburg, New York 10962 (hereinafter referred to as Tenant).

### WITNESSETH:

1. Lessor hereby leases to Tenant that certain parcel of property consisting of approximately 400 square feet located at premises designated 34 School Street, Bayville, New York, with a right of way for access *with prior notification to Lessor* thereto, seven days a week, twenty-four hours a day, all as substantially shown on Exhibit "A", attached hereto and made a part hereof.

-3-

Lessor also leases to Tenant space on the water tank (hereinafter referred to as the Tower) owned by Lessor for the purpose of installing, maintaining and operating an antenna array of up to fifteen antennas and associated transmission lines and mounting apparatus, an easement for utilities, and the right to install and maintain wires, cables and necessary connections between the equipment Tenant will install in the equipment building which Tenant shall construct on the premises and the antenna array, all as shown on Exhibit "B". Tenant shall have access at all times to the antennas for the purpose of maintaining same in good operational condition.

2. This Lease Agreement shall be for an initial term of five years, beginning on the first day of the month following Tenant's giving of notice to Lessor of its exercise of the option to lease these premises (hereinafter referred to as the Commencement Date) at an annual rental of

, to be paid in equal monthly installments of (

on the first day of the month, in advance, to Lessor or to such other person, firm or place as Lessor may, from time to time, designate in writing at least thirty days in advance of any rental payment date. Rental for years two through five of the lease term shall be calculated in the following manner: Each year's rent shall be equal to the prior year's rent, increased by the percentage increase in the total Consumer Price Index during the preceding twelve month period. The term "Consumer Price Index" shall be that index as issued by the United States Department of Labor, Bureau of Labor Statistics, for All Urban Consumers for the New York-North Eastern New Jersey Region, 1982-1984 = 100. If said index shall be discontinued, there shall be substituted therefor the most nearly comparable index published by any other governmental agency, or if no such index shall be available, then a comparable index by a major bank or by a university or recognized financial

-4-

publication then to be selected by the parties, or, if the parties cannot agree upon a selection, by arbitration.

While Tenant intends to make each payment due hereunder on or before its due date, in the event Tenant fails to make a payment within ten days after its due date Lessor will give Tenant written notice of such nonpayment and Tenant will immediately make such payment. No action may be maintained by Lessor against Tenant for such nonpayment unless Tenant has failed to make payment within ten days after receipt of such written notice from Lessor.

3.  Tenant shall have the option to extend this lease for three additional five year terms by giving the Lessor written notice of its intention to do so at least one month prior to the end of the then current lease term.

4.  The annual rental for each year of each extension term shall be calculated consistent with the provision of Paragraph 2 hereof, it being the intention of the parties that the rental shall increase by the Consumer Price Index increase during the preceding lease year.

5.  If at the end of the third five year extension term this Lease Agreement has not been terminated by either party by giving to the other written notice of an intention to terminate it at least one month prior to the end of such term, this Lease Agreement shall continue in force upon the same terms and conditions for a further term of one year and for annual terms thereafter until terminated by either party by giving to the other written notice of its intention to so terminate at least one month prior to the end of such term. Monthly rental for this period shall be equal to the rent paid for the last month of the third five year extension term.

6.  Tenant intends to use the premises for the purpose of constructing, maintaining and operating a mobile communications facility and uses incidental thereto, consisting of a building approximately 312 square feet in size to be

-5-

constructed by Tenant and equipment to be installed by Tenant therein, up to fifteen antennas to be installed by Tenant on the Tower and all necessary connecting appurtenances, all as aforesaid. Tenant may install electrical, air conditioning, sprinkler and other systems and meters as may be necessary to maintain its equipment, and all costs of services for same shall be borne by Tenant. All improvements shall be at Tenant's expense. Tenant will maintain the property in a reasonable condition.

7. Lessor acknowledges that Tenant's ability to use the premises is contingent upon its obtaining, either before or after the Commencement Date of this Lease Agreement, all of the certificates, permits, licenses and other approvals that may be required by any federal, state and local authorities. Lessor shall cooperate with Tenant in its efforts to obtain such approvals and shall take no action which would adversely affect the status of the premises with respect to the proposed use thereof by Tenant. In the event that Tenant determines, in its sole judgment, that it will be unable to obtain all necessary governmental approvals, or if any of such applications should be rejected or any certificate, permit, license or approval issued to Tenant is subsequently cancelled, expires, lapses or is otherwise withdrawn or terminated by governmental authority so that Tenant, in its exercise of reasonable judgment determines that it will be unable to use the premises for its intended purposes, Tenant shall have the right to terminate this Lease Agreement. Notice of Tenant's exercise of its right to terminate shall be given to Lessor in writing by certified mail, return receipt requested, and shall be effective upon mailing of such notice by Tenant (the Termination Date). All rentals paid to the Termination Date shall be retained by Lessor, but all rentals allocable on a pro rata basis to the period subsequent to the Termination Date shall be refunded to Tenant. Upon such termination this Lease Agreement shall become null and void and the parties shall

-6-

have no further obligation, including the payment of money, to each other, except for Tenant's obligation pursuant to Paragraph 11 hereof.

8.    In the event Tenant's transmissions and equipment create interference with the present frequency of any other tenants now on the premises, Tenant agrees, upon notification of such interference, to promptly remedy same at its cost and expense and, if necessary, to cease operations (except for tests) until such remedy is accomplished. It is recognized that interference can arise from many sources but Tenant shall be responsible only for interference created by its transmissions and equipment. Lessor agrees to protect Tenant's operations from interference by other tenants' transmissions and equipment to the extent of including a similar interference clause in Lessor's future lease agreements. Lessor agrees that it will not rent or grant space to any other tenant which will interfere with Tenant's operations, and represents that no existing lease or other arrangement now or hereafter interferes or will interfere with Tenant's operations, except with regard to existing police or emergency transmission or reception equipment which shall take priority over Tenant's radio transmissions or reception in the event of any interference.

9.    Tenant shall indemnify and hold Lessor harmless against any claim of liability or loss for personal injury or property damage resulting from or arising out of the use and occupancy of the premises by Tenant, its servants or agents, excepting, however, such claims or damages as may be due to or caused by the acts of Lessor, its employees or agents.

10.    Tenant shall provide Lessor with a certificate of insurance issued by a reputable insurance company licensed to do business in the State of New York indicating comprehensive general liability insurance in the amount of $1 million for bodily injury and $1 million for property damage, and in which Lessor is named as an additional insured with respect to the leased premises. Tenant will provide

-7-

Lessor with a renewal certificate when requested by Lessor.

11. Tenant, upon termination of this Lease Agreement, shall, within a reasonable period, remove its personal property, equipment, antennas, connections and other fixtures and restore the premises to its original condition, reasonable wear and tear excepted.

12. Should Lessor, at any time during the term of this Lease Agreement, decide to sell the leased premises or the Tower or make alterations thereto which may adversely affect Tenant's operation of its mobile communications facility, Lessor shall immediately notify Tenant in writing. Any sale or alteration, however, shall be subject and subordinate to the terms of this Lease Agreement and Tenant's rights hereunder, and Lessor shall do nothing which would interfere with the use of the premises, including the antennas, by Tenant in connection with its mobile communications operations. Tenant understands that the water tank may require maintenance, whether or not pursuant to any applicable ordinance, statute, rule or governmental regulation, which would affect Tenant's use of the premises during the period of maintenance.

Tenant agrees to cooperate with Lessor, as reasonably necessary and at Tenant's cost as respects Tenant's equipment, in order to facilitate said maintenance.

13. Lessor covenants that Tenant, on paying the rent and performing the covenants, shall peaceably and quietly have, hold and enjoy the leased premises.

14. Lessor warrants and covenants that Lessor is seized of good and sufficient title and interest to the subject premises and the Tower and has full authority to enter into and execute this Lease Agreement, and that there are no liens, judgments or impediments of title which would adversely affect this Lease Agreement. Any breach of these warranties and covenants which preclude Tenant's use of said premises and the Tower for its intended purpose shall entitle Tenant

-8-

to terminate this Lease Agreement and receive back all monies paid hereunder.

15. In the event Tenant fails to comply with any of the provisions of this Lease Agreement or to perform any of its obligations hereunder, including the payment of rent, Lessor shall give Tenant written notice of such breach or non-payment of rent, and Tenant shall have ten days after receipt of such written notice from Lessor to cure such default. No action may be maintained by Lessor against Tenant for such breach unless Tenant has failed to cure same within ten days after receipt of such written notice.

16. This Lease Agreement contains all the agreements, promises and understandings between Lessor and Tenant, and no oral agreements, promises or understandings shall be binding upon either Lessor or Tenant in any dispute, controversy or proceeding at law. Any addition, variation or modification of this Lease Agreement shall be void and ineffective unless made in a writing signed by the parties.

17. This Lease Agreement and the performance thereunder shall be governed, interpreted, construed and regulated by the laws of the State of New York.

18. This Lease Agreement may be sold, assigned or transferred at any time without the consent of Lessor to a partnership or corporation having a general partner or a controlling shareholder, respectively, which is a subsidiary or affiliate of NYNEX Mobile Communications Company. As to other parties, this Lease Agreement may not be sold, assigned or transferred without the written consent of Lessor, such consent not to be unreasonably withheld or delayed.

19. All notices hereunder must be in writing and shall be deemed validly given if sent by certified mail, return receipt requested, addressed as follows (or any other address that the party to be notified may have designated to the sender by like notice):

Tenant:    New York SMSA Limited Partnership
                2000 Corporate Drive
                Orangeburg, New York 10962
                Attn:  Manager - Real Estate

Copy to:    Joseph A. Hallock, Esq.
                Hallock & Amann
                175 Fairfield Avenue, Suite 1A
                West Caldwell, New Jersey 07006

Lessor:    Village of Bayville
                34 School Street
                Bayville, New York 11709

20.  This Lease Agreement shall inure to the benefit of and bind the heirs, personal representatives, successors and assigns of the parties hereto.

21.  At Lessor's option, this Lease Agreement shall be subordinated to any future mortgage made by Lessor which from time to time may encumber all or part of Lessor's property of which the leased premises are a part; provided, however, every such mortgage shall recognize the validity of this Lease Agreement in the event of a foreclosure of Lessor's interest and also Tenant's right to remain in occupancy of and have access to the leased premises as long as Tenant is not in default under this Lease Agreement.  Tenant shall execute whatever instruments may reasonably be required to evidence this subordination provision.

In the event the leased premises are presently encumbered by a mortgage, Lessor will obtain and furnish to Tenant a non-disturbance instrument for each such mortgage in recordable form.

22.  Lessor agrees to execute a Memorandum of Agreement to be prepared by Tenant, if requested by Tenant, which Memorandum of Agreement may be recorded by Tenant at Tenant's expense.

IN WITNESS WHEREOF, the parties hereto have set their hands and affixed

-10-

their respective seals the day and year first above written.

Witness:                              Lessor:  Village of Bayville

_Jeanne Bercos_                       By: _Edward Esposito_

                                      Edward Esposito, Mayor

                                      Date: _March 10_ , 1992


Witness:                              Tenant:  New York SMSA Limited Partnership

_Kathleen Foster_                     By: _Noreen Conlon_

                                      Noreen A. Conlon, Vice President
                                      New York Cellular Geographic
                                      Service Area, Inc.,
                                      General Partner

                                      Date: _3/12_ , 1992

## ACKNOWLEDGEMENT

STATE OF NEW YORK   :
                 : SS
COUNTY OF *NASSAU*   :

    On the 10th day of *MARCH* , 1992, before me came Edward Esposito, to me known, whom being duly sworn, did acknowledge that he is Mayor of the Village of Bayville, described in and which executed the foregoing Instrument; that the seal of the corporation is affixed hereto; and that this document was signed and made by the corporation as its voluntary act and deed by virtue of authority from its Board of Directors.

*Joseph C. R. Del Giacco*

JOSEPH C. R. DEL GIACCO
Notary Public, State of New York
No. 4612402
Qualified in Nassau County
Commission Expires March 30, 19 93
JUNE

STATE OF NEW YORK   :
                 : SS
COUNTY OF ROCKLAND   :

    On the 13th day of *March* , 1992, before me came Noreen A. Conlon, to me known, whom being duly sworn, did acknowledge that she is Vice President of New York Cellular Geographic Service Area, Inc., General Partner, described in and which executed the foregoing Instrument; that the seal of the corporation is affixed hereto; and that this document was signed and made by the corporation as its voluntary act and deed by virtue of authority from its Board of Directors.

*Ruth O'Brien*

RUTH O'BRIEN
Notary Public, State of New York
No. 4981554
Qualified in Rockland County
Commission Expires May 13, 19 93

-12-